NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11096


COMMONWEALTH  vs.  ROBERT SILVA.



Plymouth.     February 6, 2015. - June 11, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, & Hines, JJ.


Homicide.  Robbery.  Felony-Murder Rule.  Joint Enterprise.
    Search and Seizure, Warrant, Expectation of privacy,
    Clothing.  Constitutional Law, Search and seizure, Privacy.
    Malice.  Intent.  Practice, Criminal, Capital case, Motion
    to suppress, Instructions to jury, Argument by prosecutor,
    Presumptions and burden of proof.




Indictments found and returned in the Superior Court
Department on March 23, 2007.

A pretrial motion to suppress evidence was heard by Paul E.
Troy, J., and the cases were tried before Richard J. Chin, J.


Chauncey B. Wood for the defendant.
Mary E. Lee, Assistant District Attorney, for the
Commonwealth.


BOTSFORD, J.  The defendant, Robert Silva, stands convicted

of murder in the first degree on theories of extreme atrocity or

cruelty and felony-murder, and also of armed robbery.[1]  He
appeals the convictions, arguing that (1) his motion to suppress
evidence of his sneakers and evidence derived from blood found
on his sneakers was improperly denied; (2) the trial judge erred
in instructing the jury on the theory of joint venture liability
where the Commonwealth's exclusive argument was that the
defendant was guilty as a principal; (3) the judge also erred in
denying the defendant's request for an instruction on
involuntary manslaughter; and (4) the prosecutor improperly
shifted the burden of proof in her closing argument.  Finally,
the defendant argues that he is entitled to relief under G. L.
c. 278, § 33E.  We affirm the defendant's convictions.

Background.  1.  Facts.  We summarize the facts that the
jury could have found at trial.[2]  During the afternoon of June 9,
2004, the defendant and Eric Pimental, both eighteen years old,
were walking together on a path in the woods in Wareham.  They
encountered Thomas Loftus, the victim, who was intoxicated,[3] and

---

[1] The convictions followed the defendant's second trial
before a jury on these charges; the first trial ended in a
mistrial when the jury could not agree on verdicts.

[2] Some of the evidence presented at the hearing on the
defendant's motions to suppress, and the judge's findings of
fact based on that evidence, are relevant to the defendant's
appeal.  We summarize them later in connection with our
discussion of the claims raised by the defendant.

[3] The victim's blood alcohol level was .278.

they agreed that they would "roll" him.[4] After Pimental knocked the victim down to the ground, both Pimental and the defendant began to kick the victim, and the defendant jumped on the victim's chest. The defendant later stated to David Belmore, a fellow inmate of the Plymouth County correctional facility (PCCF), "You should have seen [the victim's] eyes bug out when I jumped on his chest," and that he and Pimental knew the victim was dead when his eyes ceased to move.[5] The two men moved the victim's body off the path, and the defendant and Pimental took the victim's backpack, his money, and other items the victim was carrying on his person. The defendant ended up carrying Pimental's camouflage-colored backpack with the victim's black backpack inside of it; Pimental ended up with the victim's money. Before leaving the woods, the defendant and Pimental encountered Kathy Browne, who was walking on the same path in the woods with her young son. They spoke briefly together, and Browne noticed blood on Pimental's legs. The defendant and

---

[4] There was no evidence that either the defendant or Eric Pimental knew the victim; in talking to another inmate at the Plymouth County correctional facility (PCCF) some years later, the defendant described the victim as "the guy" he and Pimental encountered on the path.

[5] David Belmore testified as a witness on behalf of the Commonwealth at trial. He had entered into a cooperation agreement with the Commonwealth on April 2, 2010, that was thoroughly explored by the defendant's counsel in his cross-examination of the witness.

Pimental then departed from the woods, separated, and the defendant went downtown, where he drank whiskey.

Some hours later, around 6:30 P.M., Thomas Joyce, the chief of police of Wareham, who was off duty, observed the defendant trying to open locked vehicles on a street in Onset, a section of Wareham. Based on his observations and conversation with the defendant, Joyce decided to place the defendant in protective custody because of the level of the defendant's intoxication.[6] Joyce opened the camouflage-colored backpack the defendant was carrying to check for possible weapons, and noted that there was another backpack inside.[7] The defendant and the backpacks were transported to the Wareham police station, and the police took custody of the backpacks. Because the police determined that

---

[6] The police had no knowledge of the victim's death at this time.

[7] See G. L. c. 111B, § 8, which provides in relevant part:

"Any person who is incapacitated may be assisted by a police officer with or without his consent to his residence, to a facility or to a police station. . . .

". . .

"A police officer acting in accordance with the provisions of this section may use such force as is reasonably necessary to carry out his authorized responsibilities. If the police officer reasonably believes that his safety or the safety of other persons present requires, he may search such person and his immediate surroundings, but only to the extent necessary to discover and seize any dangerous weapons which may on that occasion be used against the officer or other person present . . . ."

the defendant had at least one outstanding warrant, he was not released at the end of the protective custody period, but taken to the Wareham Division of the District Court Department (Wareham District Court) the following morning, June 10, 2004. Following his court appearance, the defendant remained in custody pursuant to the outstanding warrant, and was transported to the PCCF.

During that same morning, June 10, 2004, the victim's body was found off the path in the woods where the defendant and Pimental had encountered Browne the previous afternoon. In the early morning hours of the following day, June 11, based on information supplied by his then girl friend, Pimental was arrested and charged with the victim's murder. Later that day, the defendant's sneakers were seized from the PCCF pursuant to a search warrant. DNA testing performed on a sample taken from a bloodstain on one of the defendant's sneakers revealed that the sample matched the victim's blood; the likelihood that a random individual's DNA would match the sample was one in ninety-five quintillion. The bloodstain on the defendant's other sneaker was not sufficient for DNA testing.

The cause of the victim's death was blunt force trauma to the chest. His sternum was broken, and his heart lacerated by the sternum bone. His ribs on both sides of his chest were broken, and he would have been alive when that occurred. His

left lung was torn.  The injuries to his chest, heart, and lung were consistent with being stomped.  The victim's jaw was fractured, and he also had suffered blunt force trauma to the head.

2.  <u>Procedural history</u>.  The defendant was indicted on charges of murder and armed robbery in 2007.  He filed five motions to suppress evidence.[8]  The motions were heard and decided by a judge in the Superior Court (motion judge) in the summer of 2009, after an evidentiary hearing.  The motion judge allowed the motion to suppress statements (fourth motion to suppress), and allowed in part the first motion to suppress evidence of the search of the backpacks conducted by the police chief and an officer of the Wareham police department, respectively, on June 9, 2004.  The judge otherwise denied the first motion to suppress, and also denied the remaining motions (second, third, and fifth motions to suppress).[9]  After the

---

[8] The five motions were:  (1) a motion to suppress evidence obtained from warrantless search of backpacks on June 9, 2004; (2) a motion to suppress evidence obtained from a warrant search conducted at PCCF on June 11, 2004; (3) a motion to suppress evidence obtained from a warrant search conducted at the Wareham Division of the District Court Department on June 11, 2004; (4) a motion to suppress the defendant's statements made when arrested on September 29, 2006; and (5) a motion seeking relief pursuant to <u>Franks</u> v. <u>Delaware</u>, 438 U.S. 154 (1978).

[9] On appeal, the defendant challenges the denial of his motion to suppress evidence of his sneakers (second motion to suppress), but does not challenge the motion judge's rulings in any other respect.

defendant's first trial ended in a mistrial when the jury could not agree on verdicts, the defendant was retried in January of 2011 before a judge other than the motion judge (trial judge). The jury found the defendant guilty of murder in the first degree on the theories of extreme atrocity or cruelty and felony-murder, and also found him guilty of armed robbery. He was sentenced to life imprisonment without parole on the murder conviction and a concurrent sentence of from four to five years on the armed robbery conviction.[10] The defendant filed a motion for a new trial that he later withdrew.

Discussion. 1. Evidence of the defendant's sneakers. On appeal, the defendant asserts error in the motion judge's denial of his second motion to suppress, which challenged the constitutionality of the search and seizure of the defendant's sneakers from the PCCF on June 11, 2004. As indicated, the motion judge held an evidentiary hearing on the defendant's suppression motions as a group in which evidence was presented pertaining to essentially all of the motions. In considering the defendant's arguments here concerning the second motion, we

---

[10] Eric Pimental was separately tried and convicted of murder in the first degree and armed robbery. This court affirmed his convictions. See Commonwealth v. Pimental, 454 Mass. 475, 476, 485 (2009).

begin by summarizing the judge's pertinent findings and rulings.[11]

The judge found that the defendant was taken into protective custody by the Wareham police chief on the evening of June 9, 2004, taken to the Wareham District Court the following morning, and then ordered held by a District Court judge on an outstanding warrant and transported to the PCCF. After the victim's body was found on June 10, the medical examiner determined the same day that the death was a homicide, and had occurred about twenty-four hours earlier -- around 3:15 $\underline{P}$.$\underline{M}$. on the afternoon of June 9. Police investigation into the homicide led them to believe that Pimental and the defendant were involved in the crime, and Pimental was interviewed by the police on June 11.[12] Pimental ultimately told the police that both he and the defendant had fought with the victim and that the defendant had hit and kicked the victim, and also described the clothing the defendant had been wearing. One of the State police officers interviewing Pimental, State police Trooper Robert Dateo, believed the defendant was still wearing the same clothes when he was transported to the PCCF the previous day,

---

[11] The defendant does not appear to dispute the motion judge's factual findings.

[12] The motion judge did not make a finding as to when on June 11, 2004, Pimental was interviewed. It appears to have been in the very early morning hours of that date. See Pimental, 454 Mass. at 477 n.1.

June 10. Based on the information supplied by Pimental, the trooper applied for a search warrant to obtain the defendant's clothes from the PCCF for forensic testing purposes. The warrant issued at 6:15 A.M. on June 11. Captain Scott Berna of the State police, who was present when the warrant issued, then telephoned the PCCF and informed Captain Scott Petersen of the Plymouth County sheriff's department that a warrant to search for and seize the defendant's property had been secured and police would be coming to the facility to execute it. Petersen then notified the PCCF property department to get the defendant's property together, and correctional officers went to the unit where the defendant was housed and secured his sneakers.[13]

At the PCCF, a detainee is issued prison clothing and his own clothing is put into a property bag and stored until it is either picked up by the detainee's family or mailed elsewhere at the detainee's expense. The clothing must be removed from the PCCF within thirty days of the detainee's arrival. A detainee, however, may be, and often is, permitted to keep his or her footwear, and specifically sneakers, because the prison-issue sneakers are not of good quality and would not fit as well. But keeping the sneakers is a privilege, and they may be taken from

---

[13] There was no evidence presented as to the precise location of the defendant's sneakers in the unit at the time they were seized.

a detainee at any time.[14]  When police seize a detainee's
property from the PCCF pursuant to a search warrant, they
generally do not give the detainee notice or provide him with a
copy of the warrant unless it is a warrant to take a buccal
swab.[15]

In this case, after the search warrant issued, Berna drove
to the PCCF to retrieve the defendant's property at some point
during the morning of June 11, 2004.  He met a correction
officer in the facility's lobby; the officer gave him the bag
containing the defendant's clothes, including the defendant's
sneakers, and Berna gave the officer a copy of the search

---

[14] Introduced in evidence at the hearing on the motion to
suppress was the PCCF "property seizure receipt" for the
defendant's clothing.  The receipt, which is signed by the
defendant, states that "[a]ll items except court clothes,
glasses, hearing aids and approved prosthetic devices will be
considered contraband."  The receipt then lists the items of
clothing the defendant brought or was wearing, including a
shirt, two shorts, and "1 sneakers."  The receipt has an
asterisk typed on it on the line listing the sneakers.  Captain
Scott Petersen of the Plymouth County sheriff's department
testified the asterisk meant that the defendant was entitled to
keep his sneakers, although doing so was a privilege, and the
sneakers could be taken from him at any time.

[15] Petersen testified to this point.  He also stated more
generally that when the inmate is present at the time property
is seized, a copy of the warrant is given to the inmate, "[a]nd,
say, the individual, in this particular case, was Mr. Silva, had
the sneakers on his person and they were going to be executing
the search warrant, we would provide him a copy as we take the
sneakers away from him because he's physically there and
physically present."  As indicated in the text, infra, there is
no indication in the record that the defendant was given a copy
of the search warrant when his sneakers were seized.

warrant at the same time. The copy ultimately was received by the "legal department." The defendant was not present when his property was turned over to the police, and was not provided a copy of the warrant at that time. After receiving the bag containing the defendant's property, Berna took the bag to the State police barracks, where Dateo, in Berna's presence, opened it on June 14, 2004, and listed the contents on the search warrant return. Dateo then filed the return with the court on June 17.

Based on his findings, the motion judge ruled in relevant part that the defendant was required to establish that he had a subjective expectation of privacy in his clothing that also was objectively reasonable, and that given his status as an inmate at the jail, the defendant could not make the required showing.[16] On appeal, the defendant challenges the judge's conclusion. He claims that the judge equated the status and rights of a pretrial detainee with those of a convicted prisoner, and in doing so failed to recognize that, as a pretrial detainee, the defendant had a privacy right with respect to his personal clothing that society was prepared to recognize as reasonable,

---

[16] In his motion to suppress, the defendant raised a number of additional challenges to the search and seizure of his clothes and sneakers from the PCCF that the motion judge considered and rejected in his memorandum of decision. The defendant does not challenge these particular rulings on appeal, and we do not discuss them except to say that we find no error in the rulings.

and that therefore was entitled to constitutional protection. Because the officers who performed the seizure did not have a warrant in hand at the time they seized the clothing and sneakers, the defendant's argument continues, the seizure was the equivalent of a warrantless seizure that violated the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.

As the defendant acknowledges, he carries the burden of establishing that, in the circumstances presented, he retained a reasonable expectation of privacy in his sneakers. See Commonwealth v. Bly, 448 Mass. 473, 490 (2007) ("To succeed on appeal, [the defendant] must bear the threshold burden of showing that a warrantless search or seizure occurred. . . . This question is analyzed under the familiar two-part query whether [the defendant] had a subjective expectation of privacy in the items seized, and if so, whether that expectation was reasonable objectively"); Commonwealth v. Montanez, 410 Mass. 290, 301 (1991) (same). The defendant has not met this burden. Based on undisputed evidence before him, the motion judge found that as a matter of policy the PCCF deemed the personal clothing (including footwear) of individuals held in custody there, including pretrial detainees, to be contraband, and although the PCCF generally allowed inmates to keep their sneakers, the retention was a privilege that could be withdrawn at any time.

Moreover, the status of a prisoner's clothing as contraband was stated explicitly on the property seizure receipt used by the PCCF to make a record of the defendant's items of clothing being seized and stored; the defendant's signature on that receipt indicates that he was or reasonably should have been aware of the contraband status.

As indicated, the defendant argues that as a pretrial detainee, his privacy interests are entitled to greater protection in the jail setting than those of a convicted defendant serving a sentence. We agree that a pretrial detainee enjoys at least as many constitutional rights as a convicted prisoner and perhaps more. See Bell v. Wolfish, 441 U.S. 520, 545 (1979). See also United States v. Cohen, 796 F.2d 20, 23-24 (2d Cir.), cert. denied, 479 U.S. 854 (1986). But, as decisions of the United States Supreme Court considering the Fourth Amendment reflect, the legitimate penological interests and needs of a jail also are entitled to great respect. See Turner v. Safley, 482 U.S. 78, 89 (1987); Bell, supra at 545-546. See also Florence v. Board of Chosen Freeholders of the County of Burlington, 132 S. Ct. 1510, 1517 (2012) (considering constitutionality of strip searches of jailed detainees). We have recognized the need to weigh legitimate penological concerns and interests under art. 14 as well. See, e.g., Matter of a Grand Jury Subpoena, 454 Mass. 685, 689-693 (2009). There,

the court considered and rejected a challenge under art. 14 to a sheriff's policy of recording the telephone calls of "inmates" (both pretrial detainees and inmates serving a sentence) and providing the recordings to the grand jury in response to subpoena.  In doing so, the court observed that "we [have] adopted the deferential standard of review for constitutional challenges to prison regulations and policies established by the United States Supreme Court in Turner v. Safley, [supra]." Matter of a Grand Jury Subpoena, supra at 690 (citing and discussing Cacicio v. Secretary of Pub. Safety, 422 Mass. 764, 772-773 [1996]).  Here, the defendant does not challenge the validity of the PCCF's policy of treating inmates' clothing, including sneakers, as contraband.[17]  Rather, he argues that the sneakers were seized from his cell or from his person,[18] and

---

[17] Although the reason for the policy to treat clothing as contraband was not raised by the defendant in his motion to suppress and was not the subject of any testimony or other evidence introduced at the hearing on the defendant's suppression motions, we infer that the policy was one designed for reasons of security and perhaps other reasons as well, including sanitation and health.  See Kight v. State, 512 So. 2d 922, 927 (Fla. 1987), cert. denied, 485 U.S. 929 (1988), and cases cited (warrantless seizure of defendant's clothing by jail authorities was permissible even though seizure was made in order to test for evidence of crime, where legitimate health or security purposes would have entitled jail authorities to effect seizure of inmates' clothing at any time).

[18] It is not relevant to our decision here, but the defendant's assumption that if his sneakers were not seized from his cell, they must have been seized from his person, has no evidentiary support in the record.

asserts that he had a reasonable expectation of privacy related to the sneakers that was entitled to protection under the Fourth Amendment and art. 14, and that barred the seizure of the sneakers from either location.

The defendant relies particularly on Cohen, 796 F.2d at 23-24, in making his claim. In Cohen, a correction officer conducted a search of the defendant's cell in the jail facility where he was being held pending trial. The search was conducted at the direction of a prosecutor, and in conducting it, the officer focused on the defendant's papers in the cell. Based on information the officer obtained from these papers, the prosecutor thereafter obtained a search warrant for them and used the papers as evidence against the defendant at trial. Id. at 21. The court concluded that because the initial, warrantless "contraband" search was "intended solely to bolster the prosecution's case against a pre-trial detainee awaiting his day in court," id. at 23, with no purpose related to institutional security, it violated the Fourth Amendment, tainted the validity of the search warrant subsequently obtained, and required suppression of the materials seized pursuant to the warrant. See id. at 23-24. Accord, e.g., McCoy v. State, 639 So. 2d 163, 164-167 (Fla. Ct. App. 1994) (warrantless search ordered by prosecutor solely to uncover incriminating evidence from defendant's cell; denial of motion

to suppress reversed because no legitimate prison objectives justified search); State v. Neely, 236 Neb. 527, 530, 540-541 (1990) (warrantless search of defendant's property in locked jail inventory to look for evidence of crime; suppression order affirmed).  See State v. Henderson, 271 Ga. 264, 267-268 (1999), cert. denied, 528 U.S. 1083 (2000) (agreeing with principle that warrantless search of pretrial detainee's cell solely at prosecutor's request would be improper; search warrant would be required).  In this case, it is true that the seizure of the defendant's sneakers and other clothes was at the behest of police who were conducting an investigation, and was not done for institutional security reasons related to the PCCF.  But here, in contrast to the Cohen case -- and similar to Henderson, supra at 268-269 -- the police had obtained a search warrant for the defendant's clothes, on the basis of an affidavit providing probable cause, before any examination or seizure of the sneakers occurred.[19]

---

[19] Despite the existence of the search warrant, the defendant asserts that under Commonwealth v. Guaba, 417 Mass. 746 (1994), the seizure of his sneakers was unreasonable by definition because although the search warrant had issued by the time the correction officers seized the sneakers, the officers did not have a copy of the warrant with them when they did so. See id. at 754 ("we hold art. 14 [of the Massachusetts Declaration of Rights] implicitly requires law enforcement officials to possess a copy of the warrant when executing it, unless there are exigent circumstances which would permit a warrantless search").  We explain in the next paragraph of the text that at the time the sneakers were seized, the defendant

Moreover, in order to claim constitutional protection against the seizure of his sneakers, the defendant must show that he had an actual expectation of privacy in them that society would be prepared to recognize as objectively reasonable.  Matter of a Grand Jury Subpoena, 454 Mass. at 688, quoting Commonwealth v. Blood, 400 Mass. 61, 68 (1987).  Even if we assume that the defendant had a subjective expectation of privacy related to his sneakers, it would not be one that is objectively reasonable; the circumstances previously discussed make this clear.[20]  As discussed, this court has long held that the monitoring and recording of detainees' and other inmates' telephone calls in a jail or house of correction, when the inmates have notice of the policy, does not violate the Fourth Amendment or art. 14.  See, e.g., Commonwealth v. Rosa, 468 Mass. 231, 242-244 (2014); Matter of a Grand Jury Subpoena,

---

did not have a reasonable expectation of privacy in them that was entitled to protection under art. 14.  Accordingly, we need not decide the defendant's Guaba claim or consider whether there are circumstances in which the "rule" of Guaba may not apply.

[20] In terms of circumstances, we focus on the following: the defendant was lawfully being held in custody at the PCCF on an outstanding warrant; the PCCF had a policy, unchallenged by the defendant, of treating the personal clothing belonging to all inmates, including pretrial detainees, as contraband, presumably as a security measure; and the defendant was or reasonably can be held to have been aware of the policy, having signed the "property seizure receipt" on the day of his arrival at the institution.  The personal papers of the defendant at issue in United States v. Cohen, 796 F.2d 20, 21 (2d Cir.), cert. denied, 479 U.S. 854 (1986), would not appear to be covered by the PCCF policy.

supra at 688-693; Cacicio, 422 Mass. at 770-773.  As we recently determined in relation to inmate mail deemed contraband by jail officials, see Commonwealth v. Jessup, 471 Mass. 121, 127-134 (2015), we conclude here that as a pretrial detainee in a jail facility with a legitimate policy in place of treating detainee and inmate clothing as contraband -- a policy of which the defendant had notice -- the defendant had no constitutionally protectable privacy interest in his sneakers that prevented their seizure.

2.  Joint venture.  The defendant argues that the trial judge committed constitutional error by instructing the jury on joint venture liability, over defense counsel's objection.  The argument is not that there was insufficient evidence of a joint venture between the defendant and Pimental, but rather that the instruction violated his constitutional right to due process because he had no notice that a joint venture theory would be advanced.

The defendant's claim lacks merit.  As the Commonwealth points out, the opening statement of the prosecutor clearly reflected the Commonwealth's position that the defendant and Pimental acted together in committing the murder, as did the defendant's own statements about committing the crime that were

introduced through the testimony of one of the Commonwealth's central witnesses, David Belmore.[21]

The defendant suggests a denial of due process here because the Commonwealth presented the defendant to the jury only as having participated directly in the killing and therefore as a "principal," whereas through the vehicle of the judge's joint venture instruction, the jury were permitted to convict him as an "accomplice" or "joint venturer," a theory of guilt that had never been presented during trial and in response to which he lacked an opportunity to prepare a defense. The defendant's argument, however, appears to be premised on an incorrect view of joint venture principles. To prove that a defendant committed a crime as part of a joint venture, the Commonwealth must prove beyond a reasonable doubt that the defendant "knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense." Commonwealth v. Zanetti, 454 Mass. 449, 466 (2009). There is no requirement that the Commonwealth prove precisely what role the defendant played -- whether he acted as a principal or an accomplice (or joint venturer). Rather, as Zanetti reflects, what matters is only that there be proof of

---

[21] Nor could any claim be made that the Commonwealth's request for, and the judge's decision to give, a joint venture instruction was a surprise. A joint venture instruction had been given during the defendant's first trial, and the same trial counsel represented the defendant in both trials.

(1) the defendant's knowing participation in some manner in the commission of the offense; and (2) the defendant's intent -- i.e., proof that the defendant had or shared in the intent necessary for the offense of which he is convicted.  See id. at 466-468 & n.22.  The evidence presented by the Commonwealth in this trial indicated that both the defendant and Pimental actively participated in the killing of the victim, and also that the defendant did so with the intent necessary to commit murder.  There was no error in charging the jury on joint venture.

3.  Involuntary manslaughter instruction.  The defendant claims reversible error in the trial judge's decision not to give an instruction on involuntary manslaughter.  We disagree.  The trial evidence concerning the defendant's actions and role in the killing of the victim was presented by the Commonwealth's witness Belmore, who testified to conversations he had had with the defendant while they were both incarcerated in the same jail.  That evidence indicated that after Pimental knocked the victim down, he and Pimental together kicked the victim with Pimental kicking him in the head, and that the defendant jumped on the victim's chest, making the victim's eyes "bug out."  According to the defendant, he and Pimental knew the victim was dead when "his eyes stopped moving."  The injuries sustained by the victim, which were consistent with someone jumping or

stomping on his chest, were multiple and severe:  a broken sternum, an injury that, according to the medical examiner, was consistent with a great deal of force being applied; a lacerated heart and torn lung; and broken ribs on both sides of his body, also involving significant force.  The victim's additional injuries included a broken jaw and blunt force trauma to the head such that his face was unrecognizable.

The intent necessary to prove murder in the first degree on the theory of extreme atrocity or cruelty includes (1) an intent to commit grievous bodily harm or (2) an intent to commit an act that, in the circumstances known to the defendant, created a plain and strong likelihood that death would follow (third prong malice).  Commonwealth v. Pimental, 454 Mass. 475, 480 (2009).  The intent necessary to prove involuntary manslaughter is an intent to commit an act that "involves a high degree of likelihood that substantial harm will result to another."  Commonwealth v. Vizcarrondo, 427 Mass. 392, 396 (1998), S.C., 431 Mass. 360 (2000), quoting Commonwealth v. Sires, 413 Mass. 292, 303 n.14 (1992).  The circumstances of the killing and injuries sustained by the victim are not consistent with anything other than intent to do grievous bodily harm or an

intent qualifying as third prong malice. The trial judge did not err in declining to instruct on involuntary manslaughter.[22]

4. Prosecutor's closing argument. In her closing argument, the prosecutor stated:

> "Now, the defense has suggested that Eric Pimental acted alone and that this defendant did nothing but stand by. There is not a scintilla of evidence to support that proposition, ladies and gentlemen. . . . [T]hree men walked into the woods and only two came out. And those two men walked out of those woods together, and they were both carrying the property of [the victim]. [T]hey both had the blood of [the victim] on their shoes." (Emphasis added.)

The defendant contends that the prosecutor's statement about "not a scintilla of evidence" improperly shifted the burden of proof to the defendant. We disagree. In context, the argument represented a response to defense counsel's closing argument in which he summarized the evidence of blood and other physical evidence linking Pimental directly to the crime, and the paucity of such evidence relating to the defendant, and then argued that the defendant had been present with Pimental when the latter killed the victim, but had not actively participated in the crime -- that his conduct in not interfering and stopping

---

[22] In any event, the jury also convicted the defendant of murder in the first degree on a theory of felony-murder, with armed robbery as the predicate felony. A defendant is not entitled to an instruction on involuntary manslaughter in connection with the theory of felony-murder. See Commonwealth v. Jessup, 471 Mass. 121, 135 (2015); Commonwealth v. Selby, 426 Mass. 168, 172 (1997).

his companion was morally "troubling", but was not a crime.[23] The prosecutor was entitled to respond to the defense argument and also to comment on the strength of its case and weakness of the defense, "as long as argument is directed at the defendant's defense and not at the defendant's failure to testify." Commonwealth v. Garvin, 456 Mass. 778, 799 (2010). Considering the challenged phrase in the context of the prosecutor's entire argument, we find no error.

5. Relief pursuant to G. L. c. 278, § 33E. We have thoroughly reviewed the evidence and record in this case, and find no basis on which to grant relief to the defendant pursuant to G. L. c. 278, § 33E.

Judgments affirmed.

---

[23] Defense counsel argued:

"I know for many people it's troubling that Mr. Silva would even be present, okay, and that it's morally troubling that he didn't intervene. I understand that. But that is not a crime. It's not right, but it's not a crime. We're here to determine not whether he acted, necessarily, the way we would have wished he had acted that day, but we're here to determine whether he committed a crime."