NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11684

COMMONWEALTH  vs.  ADAM CASSINO.


Suffolk.      December 11, 2015. - April 8, 2016.

Present:  Gants, C.J., Cordy, Botsford, Lenk, & Hines, JJ.


Homicide.  Search and Seizure, Clothing, Warrant, Probable
cause.  Constitutional Law, Search and seizure, Probable
cause.  Probable Cause.  Deoxyribonucleic Acid.  Mental
Impairment.  Jury and Jurors.  Practice, Criminal, Capital
case, Motion to suppress, Instructions to jury, Voir dire,
Jury and jurors.



Indictment found and returned in the Superior Court
Department on November 15, 2011.

Pretrial motions to suppress evidence were heard by Charles
J. Hely, J., and the case was tried before Garry V. Inge, J.


Azi Safar for the defendant.
Zachary Hillman, Assistant District Attorney (Ian
Polumbaum, Assistant District Attorney, with him) for the
Commonwealth.


HINES, J.  In August, 2011, a sixty-five year old woman was

found dead in her apartment in the South Boston section of

Boston.  She was the victim of blunt force trauma caused by a

baseball bat. The defendant, Adam Cassino, was indicted for the crime and a jury convicted him of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. On appeal, the defendant claims (1) error in the denial of his three motions to suppress evidence stemming from a claimed illegal search of his clothing and shoes that were stored in a secured area while he was civilly committed pursuant to G. L. c. 123, § 35; (2) error in the presentation of deoxyribonucleic acid (DNA) results; (3) error in the failure to give a diminished capacity instruction; and (4) abuse of discretion in the judge's juror bias determination. We affirm the order denying the defendant's motions to suppress as well as the defendant's convictions, and we discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

1. Motion to suppress. a. Background. After the discovery of the victim's body on August 27, 2011, the police investigation soon focused on the defendant, the victim's neighbor, as a possible suspect. The investigation led police to the Massachusetts Alcohol and Substance Abuse Center (center) where the defendant had resided since August 24, 2011, after being civilly committed for drug treatment under G. L. c. 123, § 35. On August 29, 2011, two days after the discovery of the body, two Boston police detectives went to the center to interview the defendant. While there, the detectives viewed the

defendant's clothing and shoes and observed reddish brown stains on the shoes. On August 31, 2011, police applied for and obtained a warrant seeking the authority to search and seize the clothing and shoes. The affidavit submitted in support of the warrant application referenced the reddish brown stains. Later that same day, police seized the items from the center pursuant to the warrant.

On September 8, 2011, police submitted applications for two additional search warrants, one pertaining to the apartment where the defendant stayed on August 23, 2011, the night before he was apprehended for the G. L. c. 123, § 35, civil commitment and the other for the defendant's primary residence. The affidavits accompanying both applications cited the forensic evidence obtained from the defendant's shoes, including that DNA samples from the reddish brown stains matched the known DNA profile of the victim.

The defendant filed three motions to suppress, claiming, on State and Federal constitutional grounds, that the viewing of his clothing and shoes at the center was an illegal, warrantless search and that the three subsequent search warrants for the shoes and the two residences, based on that illegal "search," lacked probable cause. As background for the analysis of this issue, we summarize the relevant facts from the affidavit submitted in support of the warrant application dated August 31,

2011, and from the undisputed testimony adduced at the hearing on the motion to suppress.

The last known contact with the victim occurred Monday evening, August 22, 2011, and the last outgoing call from her cellular telephone was the next afternoon. Police estimated that the murder occurred sometime between Monday and Tuesday evenings. During a search of the victim's apartment, police seized an empty bottle of Clonazepam that was issued to the victim on August 11, 2011, and initially contained ninety pills. Police believed, based on witness interviews,[1] that the victim had been having ongoing problems with the defendant and that he had stolen her prescription medication and other belongings in the past. A neighbor reported that the defendant stole prescription medicine from her that Monday. The defendant told police that he met with the victim that Monday evening to discuss buying pills. He stated that he would have purchased some, but he did not have any money.

Blood on the victim's hands and nails indicated that she struggled with, and possibly caused injury to, her attacker.

---

[1] The affidavit does not state whether these interviews occurred before or after detectives spoke with the defendant and viewed his personal property at the Massachusetts Alcohol and Substance Abuse Center (center) on August 29, 2011. The Commonwealth may rely on evidence obtained before or after an illegal search if it can show that the evidence was independently obtained. Commonwealth v. Estabrook, 472 Mass. 852, 868 n.26 (2015).

Moreover, the police asserted in the search warrant affidavit that "the damage to the victim coupled by the amount of blood throughout the scene showed an extreme force which would have made it very difficult for any person involved, or even present, to avoid a transfer of some blood evidence to either themselves or their clothing or footwear."

The defendant's mother told police that the defendant was taken into custody for civil commitment on a warrant of apprehension on August 24, 2011, a process she started the day before because of the defendant's substance abuse. The defendant arrived at the center with injuries to his hand and knee. The inner perimeter security commander for the center testified that booking and admission procedures require that the clothing and shoes of a person committed under G. L. c. 123, § 35, be taken and stored in a secure property storage area. Property is returned to its owner after discharge, or it is transferred to follow the owner to any future confinement.

On August 29, 2011, two Boston police detectives interviewed the defendant at the center and requested to view the defendant's personal property.[2] A sergeant retrieved the

---

[2] The Commonwealth contests the motion judge's finding that the viewing occurred at the request of the detectives, asserting a lack of evidence to support this finding. We are not persuaded that the finding is clearly erroneous because the affidavit supporting one of the September 8 warrant applications

property from the storage facility, opened the bag containing the defendant's clothing and shoes, and lifted the items out of the bag so that the detectives could view the items.  As noted, reddish brown stains were visible on the defendant's shoes.

b.  Discussion.  "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [his] ultimate findings and conclusions of law.'"  Commonwealth v. Craan, 469 Mass. 24, 26 (2014), quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004).  We "make an independent determination of the correctness of the judge's application of constitutional principles."  Commonwealth v. Woods, 466 Mass. 707, 717, cert. denied, 134 S. Ct. 2855 (2014), quoting Commonwealth v. Mercado, 422 Mass. 367, 369 (1996).

The judge denied the defendant's motions, concluding that the defendant had no reasonable expectation of privacy in the clothing and shoes when the officers first observed them at the center and that all three warrants were supported by probable cause.  On appeal, the defendant reprises his argument that the viewing of his personal items was a warrantless search that unlawfully infringed on his reasonable expectation of privacy and tainted the three warrant applications.

---

stated that the detectives requested a view of the defendant's property.

"Warrantless searches are presumptively unreasonable, under both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, subject only to 'a few specifically established and well-delineated exceptions.'" Commonwealth v. Gouse, 461 Mass. 787, 792 (2012), quoting Commonwealth v. Bostock, 450 Mass. 616, 624 (2008). The defendant bears the "burden of showing that a warrantless search or seizure occurred." Commonwealth v. Bly, 448 Mass. 473, 490 (2007), citing Commonwealth v. D'Onofrio, 396 Mass. 711, 714-715 (1986). "This question is analyzed under the familiar two-part query whether [the defendant] had a subjective expectation of privacy in the items seized, and if so, whether that expectation was reasonable objectively." Bly, supra.

The defendant asserts that he had a subjective expectation of privacy that society would deem reasonable because he surrendered his personal property with the expectation the property would be returned to him. He asserts that the storage of his property in compliance with the center's policy created an involuntary bailment and the sergeant exceeded his authority by producing the items for viewing by detectives. The Commonwealth counters that any expectation of privacy the defendant may have had was not reasonable, analogizing to Commonwealth v. Silva, 471 Mass. 610, 619-620 (2015), in which we considered whether a pretrial detainee who was on notice of

the facility's policy treating detainee and inmate clothing as contraband has a constitutionally protectable privacy interest in such clothing. We held that there was not, because any expectation of privacy was not objectively reasonable under those circumstances. Id. Our decision in Silva is not dispositive, however, because the center had no policy treating the defendant's property as contraband. The center's policy specifically distinguishes between street clothes, shoes, and contraband.[3]

Although the defendant's challenge to the search warrant rests on the claim that the police viewing of his property was an illegal search, we bypass the issue because the legality of the search is not determinative of the propriety of the judge's order denying the motion to suppress. The denial of the defendant's motions to suppress was proper under the principle that, "[e]ven though the exclusionary rule generally bars from admission evidence 'obtained during an illegal search as fruit of the poisonous tree, evidence initially discovered as a

---

[3] Under the section titled, "Property for Commitments," which is applicable to the defendant's status as a person civilly committed pursuant to G. L. c. 123, § 35, the policy states, "When a commitment is admitted into the institution, his street clothes (except shoes and/or contraband) will be inventoried, laundered, boxed and stored in the Property Room." The defendant in Commonwealth v. Silva, 471 Mass. 610, 615 n.14 (2015), signed an intake form stating that his personal property would be treated as contraband. Conversely, the intake records submitted in this case do not make any such reference.

consequence of an unlawful search may be admissible if later acquired independently by lawful means untainted by the initial illegality.'" Commonwealth v. Estabrook, 472 Mass. 852, 865 (2015), quoting Commonwealth v. DeJesus, 439 Mass. 616, 624 (2003).  Accordingly, the evidence deriving from the defendant's shoes was admissible "as long as the affidavit in support of the application for a search warrant contains information sufficient to establish probable cause to [seize the defendant's shoes], apart from the observation of the [reddish brown stains]." Commonwealth v. Gray, 465 Mass. 330, 346, cert. denied, 134 S. Ct. 628 (2013), quoting DeJesus, supra at 625.  To establish probable cause, "[a]n affidavit must contain sufficient information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that the items reasonably may be expected to be located in the place to be searched at the time the search warrant issues." Commonwealth v. Almonte, 465 Mass. 224, 233 (2013), quoting Commonwealth v. Wilson, 427 Mass. 336, 342 (1998).

The affidavit in support of the warrant to search and seize the defendant's shoes included the following information.  The defendant previously had stolen prescription medication from the victim.  He admitted to being with her during the period when the murder was estimated to have occurred.  He told police that

he wanted to buy her prescription medication at that time, but he did not have the money. The defendant was apprehended for civil commitment to treat substance abuse issues no more than thirty-six hours after the murder was estimated to have occurred. The crime scene indicated that the assailant likely would have injuries and blood evidence on his or her clothing and shoes. The defendant's clothing and shoes were stored at the center. The affidavit also linked the defendant to the victim during the estimated time of her murder, established a conflict between the two, and created a reasonable inference that the defendant may have brought some or all of the items he was wearing at the time of the murder into the center. Thus, we conclude that the affidavit supporting the August 31 warrant application contained sufficient facts, traceable to sources independent of the reddish brown stains observed on August 29, to establish probable cause.

Because a valid search warrant would have issued regardless of the inclusion of the reddish brown stains observed on the defendant's shoes, there was an independent source for the challenged evidence. See Gray, 465 Mass. at 347. On this basis, we affirm the denial of the defendant's motion to

suppress the shoes.[4]  The defendant's challenges to the other two

warrants are premised on the same argument.  Although the

defendant claims that the September 8 warrants impermissibly

relied on evidence derived from the shoes, he does not argue

that they otherwise lack probable cause.  Because we conclude

that the shoes were lawfully seized, and thus, evidence deriving

from them was properly included in the two affidavits dated

September 8, we do not address those warrants except to note our

agreement with the denial of the defendant's three motions to

suppress.

2.  Trial.  a.  Background.  We recite the facts as the

jury could have found them, reserving other facts for later

discussion.  On Saturday, August 27, 2011, the body of the

victim was found by her daughter and the daughter's boy friend.

On Tuesday afternoon, August 23, the victim left a voicemail

message for her daughter.  Because the daughter could not

contact her after that voicemail, she went to the victim's

apartment on Friday and Saturday to check on her.  On Saturday,

---

[4] We reject the defendant's argument that the independent
source doctrine is not appropriate in this case because there
was no mistake or inadvertence on the part of police.  The
independent source doctrine balances the "interest of society in
deterring unlawful police conduct and the public interest in
having juries receive all probative evidence of a crime . . . by
putting the police in the same, not a worse, position [than]
they would have been in if no police error or misconduct had
occurred."  Estabrook, 472 Mass. at 868 n.26, quoting
Commonwealth v. Frodyma, 393 Mass. 438, 443 (1984).

the daughter's boy friend entered the apartment through a window in the rear of the house leading to the victim's bedroom.

Once inside, he saw the apartment in disarray and with blood in several areas.  The victim's feet were sticking out from under a blanket on the couch.  He and the daughter telephoned 911.  They started cleaning up pipes used to smoke "crack" cocaine and needles that were in the apartment, but then realized it was a crime scene and placed those items on the counter.

Boston police arrived to process the scene and canvass the neighborhood for information.  A criminalist observed that the assault had occurred in the main living area and that the body was later moved to the couch and covered with a blanket.  The victim had severe trauma to the head, and the police did not find anything in the apartment that was consistent with being the murder weapon.  Police found an empty pill bottle that was labeled as Clonazepan, filled on August 11, 2013, and has a brand name of Klonopin.  A v-neck T-shirt and gray cut-off shorts, both wet, were collected from the bathroom.

The medical examiner who performed the autopsy determined the cause of death to be blunt impact injuries to the victim's head.  He concluded that a cylindrical, round object such as a baseball bat or pipe caused the injuries.  The autopsy revealed decomposition, which begins approximately thirty-six hours after

death, and mummification, which begins four to five days after death. From that information, he estimated that death occurred more than thirty six hours before the body was found, by at least "several days." The prosecutor argued that the defendant murdered the victim between late afternoon Tuesday and Wednesday morning.

The victim sold prescription Klonopin pills, sometimes using the money to purchase "crack" cocaine. The defendant lived across the street from the victim and had previously purchased drugs from her. His mother testified that he had relapsed into taking drugs approximately one week before the victim's body was found. Although she said that he agreed to go to a treatment facility for a "few" days, he would not agree to a longer period. She threatened to have him civilly committed for treatment several times. The defendant was accused of stealing prescription pills from a different woman who lived in the same building as the victim. Following the neighbor's accusation, the defendant's mother kicked him out of the house and, on Tuesday afternoon, went to court to have him committed.

The defendant was apprehended for commitment early on Wednesday morning. Between the time that his mother kicked him out of the house and when he was apprehended, he stayed at the nearby house of his friend, Thomas Kinsella. Kinsella's house

and the victim's apartment are connected by a staircase in the rear of both buildings.

Kinsella and his sister, who was at Kinsella's house on Tuesday with her young daughter, testified that defendant was gone for approximately a three-hour period sometime after 2 or 3 P.M. Kinsella's sister testified that the defendant left the house wearing a white T-shirt and black mesh shorts and returned sweaty and wearing a black Boston team shirt and cargo shorts. Kinsella and his sister both testified that defendant said he had been helping a neighbor with yard work. The neighbor testified that the defendant did not help him in the yard that day.

After he returned, the defendant filled two plastic grocery bags and placed them outside the door to Kinsella's apartment. A neighbor testified that he saw the defendant's brother placing a plastic store bag in a trash receptacle in front of a convenience store, but he could not recall when that occurred. The defendant's brother testified that he only used the trash can for his family's home, not the one at the convenience store.

Kinsella and his sister went to bed at approximately 7:30 P.M. The defendant was at Kinsella's house when they went to bed. Kinsella's sister woke up at approximately 6:30 A.M. on Wednesday, and the defendant was in the living room with items from a doughnut shop for her and her daughter.

In addition to the seizure of the defendant's shoes discussed supra, police seized a baseball bat from Kinsella's home, which had one fingerprint on the grip and reddish brown stains. Blood found on the grip, barrel, and butt of the bat was consistent with the victim's DNA profile.[5] Handler DNA taken from the grip of the bat contained a mixture that was consistent with three DNA profiles: the victim, the defendant, and Kinsella.[6] When testing for handler DNA, the analyst swipes an entire area to determine if any nonvisible DNA may be collected from locations where an item is typically handled. The tongue of the defendant's right shoe and the sole of the left shoe contained a mixture of DNA that was consistent with DNA profiles for the victim and the defendant.[7] Kinsella was excluded as a possible contributor to the DNA found on the shoes.

---

[5] An analyst testified that the statistical probability of a match in the general population to the blood found on the bat consistent with the victim's deoxyribonucleic acid (DNA) profile was in the trillions to septillions.

[6] The analyst testified that the statistical probability of a match in the general population to the handler DNA found on the grip of the bat consistent with the defendant's DNA was in the millions and billions. No statistics were provided for the handler DNA consistent with the victim or Kinsella.

[7] The analyst testified that the statistical probability of a match in the general population to the defendant's DNA found on the sole of the left shoe was one in four Caucasians, one in twenty African Americans, and one in five Southeastern Hispanics. The analyst did not provide statistical probabilities for a match in the general population to the

The defendant, who did not testify or present witnesses, argued through cross-examination and closing that lack of motive and faulty police investigation created reasonable doubt.  He named Kinsella as the killer and argued that the defendant's DNA was on the baseball bat because he took the bat from Kinsella's niece the morning before he was committed and that Kinsella wore his shoes to commit the murder.

b.  DNA evidence.  Relying on Commonwealth v. Mattei, 455 Mass. 840, 855 (2010), in which we held that nonexclusion DNA results must be presented with statistics explaining the significance of that evidence, the defendant challenges the admission of evidence that the victim's blood was on his shoes because the DNA test results were not provided with statistics. Where the defendant did not object at trial and claims that counsel was ineffective for failing to preserve the issue, we review under G. L. c. 278, § 33E, "to determine whether any

---

defendant's DNA found on the tongue of the right shoe or the victim's DNA found on either shoe.  The parties agreed to enter the DNA report by the Boston police crime laboratory in the appellate record.  The conclusions contained in the report demonstrate that the statistical probability for a match in the general population to the victim's DNA on the sole of the left shoe is in the trillions and quintillions, and that the statistical probability for a match in the general population to the victim's DNA on the tongue of the right shoe is in the millions and billions.  The report also demonstrates that the statistical probability for a match in the general population to the defendant's DNA on the tongue of the right shoe is one in 8.1 million Caucasians, one in 1.5 billion African-Americans, and one in 130,000 Southeastern Hispanics.

substantial conduct or omission by counsel 'was likely to have influenced the jury's conclusion.'" Commonwealth v. Montez, 450 Mass. 736, 754 (2008), quoting Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

The defendant's argument is unavailing. The DNA report by the Boston police crime laboratory was provided to the defendant before trial. The report stated that the statistical likelihood of a match in the general population to the victim's DNA profile taken from the defendant's shoes was in the millions to quintillions. Where the statistics in this case, if admitted, would have demonstrated that the likelihood of another person besides the victim leaving the DNA on the defendant's shoes was less than one in one million, the evidence would have been damaging to the defendant. Underlying our holding in Mattei was the concern that nonexclusion DNA results without statistics could mislead jurors into thinking that the results are conclusive when the DNA could have been left by "half the people in the world." Mattei, 455 Mass. at 852, quoting Commonwealth v. Mattei, 72 Mass. App. Ct. 510, 522 (2008) (Rubin, J., dissenting). Such a concern is not applicable to the facts of this case, where the statistics would have demonstrated the high probability that the DNA on the defendant's shoes belonged to the victim.

c.  Jury instruction on mental impairment.  The defendant argues that the judge committed reversible error by failing to instruct the jury that they could consider evidence of the defendant's consumption of drugs as it related to his ability to act with extreme atrocity or cruelty or with deliberate premeditation.  If requested, a defendant is entitled to such an instruction.  See Commonwealth v. Doucette, 391 Mass. 443, 455 (1984), citing Commonwealth v. King, 374 Mass. 501, 508 (1978) (premeditation), and Commonwealth v. Perry, 385 Mass. 639, 648-649 (1982), S.C., 424 Mass. 1019 (1997) (extreme atrocity or cruelty).  Additionally, a judge must instruct the jury that they could consider evidence of a defendant's mental impairment on the question of extreme atrocity or cruelty where evidence of such "mental impairment is significant and where it is a critical aspect of [his] defense."  Commonwealth v. Rutkowski, 459 Mass. 794, 799 (2011).

In this case, the defendant did not request such an instruction or specifically object to its omission.  The defendant requested a manslaughter instruction, and the Commonwealth objected, arguing that there was no specific evidence of drug or alcohol use that had any effect on the defendant's state of mind.  The defendant asserted that the relevant evidence was the Commonwealth's theory that the defendant "was in such a state of withdrawal that he was willing

and able and actually did . . . kill someone to get her prescription bottle of Klonopin."[8]  The judge denied the defendant's request, and the defendant objected.  The defendant concedes that this discussion was not sufficient to preserve the issue, and we review to determine if any error created a substantial likelihood of a miscarriage of justice.  Commonwealth v. Smith, 449 Mass. 12, 19 (2007), citing Commonwealth v. Berry, 420 Mass. 95, 113 (1995).

The omission of a mental impairment instruction in this case did not create a substantial likelihood of a miscarriage of justice.  First, mental impairment was not central to his defense where the defendant argued that someone else was the perpetrator.  See Commonwealth v. Sanna, 424 Mass. 92, 102 (1997).  Also, there was nothing close to "significant" evidence of the defendant's mental impairment.  Contrast Rutkowski, 459 Mass. at 798-799.

Several witnesses testified about the defendant's behavior around the estimated time of the murder.  The defendant's mother and sister both testified that the defendant was "upset" on

---

[8] Trial counsel argued that the "strongest" evidence of the defendant's mental impairment was the judicial determination on August 24, 2011, which occurred according to the Commonwealth's theory between one and twenty-four hours after the murder, that he was in a "state that was associated with drug intoxication and/or withdrawal."  The Commonwealth correctly asserted, however, that the judicial finding that led to the commitment is not in evidence.

Monday and Tuesday afternoons because he had been kicked out of the house. Kinsella testified that the defendant was upset on Tuesday afternoon before the two- to three-hour period when he was unaccounted for and that he returned "more relaxed." Kinsella noted that the defendant had one and one-half Suboxone pills (a medication to treat opiate dependency) when he returned, but Kinsella had no knowledge about whether the defendant took the pills. The police officers who apprehended the defendant for commitment on Wednesday morning testified that the defendant appeared "nervous" but cooperated after being told that he was being committed, and he asked questions relevant to the apprehension. Significantly, no witness noted that the defendant appeared impaired or testified to any observations of the defendant's consumption of drugs or alcohol.

Because any diminished capacity instruction would have been of minimal significance considering the lack of evidence demonstrating any mental impairment, we conclude that the failure to give such an instruction did not create a substantial likelihood of a miscarriage of justice.[9] See Commonwealth v. Rosado, 434 Mass. 197, 207, cert. denied, 534 U.S. 963 (2001).

---

[9] Moreover, it appears that the jury did consider the defendant's mental state in their deliberations. The foreperson submitted the following question to the judge: "When [the defendant] was admitted to the [center] what did his toxicology report read?" The judge responded that the jury must reach a

d.  Juror bias.  During the afternoon break on the third day of trial testimony, an individual who had been watching the trial approached defense counsel and told him that he overheard two jurors discussing the trial during the morning break.  The judge conducted a voir dire, and the individual explained that he was at the court for a civil case scheduled for 2 P.M. and decided to sit in on this trial while he waited.  He said he was outside smoking during the morning break when he heard a female juror telling a male juror that "the witness was not credible" and the male respond, "nobody's paying attention to the case, and he probably guilty already."[10]  After he heard the two talking, the individual started eavesdropping by pretending that he was looking at a statue.  The individual told the judge that he had been falsely accused of murder in the early 1990s, and the conversation bothered him because he knew from his murder trial that jurors were not supposed to talk to each other about the case.  The individual provided conflicting testimony about the timing of his realization that the conversation was between two jurors.

---

verdict based on the evidence before them and may not engage in speculation.

[10] Later in his voir dire testimony, the individual attributed the statement, "he's probably guilty already," to the female juror.

The judge conducted a voir dire of the two jurors in question. The female juror, in seat three, testified that she did not remember speaking to anyone and did not remember making any statements about a witness's credibility or the guilt of the defendant. The juror said that she did not "really know all the jurors so [she did not] speak to any of them" and did not know "who the black male is with beige pants." Lastly, she told the judge that she could say with confidence that she did not make the statements attributed to her.

The judge then conducted a voir dire of the male juror in seat nine. The juror testified that he did speak with the female juror, and referred to her correctly by her first name, but said that they were discussing a case in Florida that was in the news at the time and did not discuss this case. The juror stated that the only reference he may have made to this case was to say that he was keeping a clear mind.

The judge discussed an option of making the female juror an undisclosed alternate, but instead determined that the juror was indifferent. He found the two jurors to be credible and the individual to lack credibility, and he rejected defense counsel's argument that the testimony by the two jurors was contradictory. Neither juror was chosen as an alternate.

The defendant argues that the judge abused his discretion in finding the female juror to be impartial. Because "[t]he

determination of a juror's impartiality 'is essentially one of credibility, and therefore largely one of demeanor,' . . . we give a trial judge's determination of impartiality great deference" (citations omitted). Commonwealth v. McCowen, 458 Mass. 461, 493 (2010). Accordingly, we review questions of juror bias for "clear abuse of discretion or a showing that the judge's findings were clearly erroneous." Commonwealth v. Torres, 437 Mass. 460, 469 (2002), quoting Commonwealth v. Amirault, 399 Mass. 617, 626 (1987), S.C., 404 Mass. 221 (1989).

Specifically, the defendant argues that the female juror was intentionally dishonest and should have been excused. We conclude that the judge did not abuse his discretion, as the testimony of the two jurors was not necessarily contradictory. Although the male juror testified that the two spoke, it is possible that the female juror did not recall the conversation because it was not concerning this case. Moreover, we cannot say that the juror's statement that she did not know "who the black male is with beige pants" was dishonest as even the court officers first obtained the wrong juror based on that description, and the individual had to correct them so that the proper male juror was identified. Our review demonstrates that the judge reasonably could have found the juror credible and, therefore, did not abuse his discretion.

3.  <u>Relief pursuant to G. L. c. 278, § 33E</u>.  We have examined the record pursuant to our duty under G. L. c. 278, § 33E, and we discern no basis on which to grant the defendant relief.

<u>So ordered</u>.