NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11479


COMMONWEALTH  vs.  ANTONIO MARCOS FERREIRA.



Middlesex.      November 9, 2018. - March 18, 2019.

Present:  Gants, C.J., Gaziano, Lowy, Budd, & Cypher, JJ.


Homicide.  Evidence, Exculpatory, Admission by silence,
     Consciousness of guilt, Testimony at prior proceeding.
     Deoxyribonucleic Acid.  Search and Seizure, Probable cause,
     Exigent circumstances, Warrant, Affidavit.  Probable Cause.
     Constitutional Law, Search and seizure, Probable cause,
     Admissions and confessions.  Practice, Criminal, Capital
     case, Motion to suppress, New trial, Admissions and
     confessions.




     Indictments found and returned in the Superior Court
Department on November 19, 2009.

     A pretrial motion to suppress evidence was heard by Bruce
R. Henry, J.; the case was tried before Elizabeth M. Fahey, J.,
and a motion for a new trial, filed on May 15, 2017, was
considered by her.


     James E. Methe for the defendant.
     Hallie White Speight, Assistant District Attorney, for the
Commonwealth.


     GAZIANO, J.  In the early morning of October 2, 2009, the

victim, Sheila dos Santos, was stabbed to death near the back

entrance to her apartment building.  A Superior Court jury convicted the defendant, her former boyfriend, of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty.

In this consolidated appeal from his conviction and from the denial of his motion for a new trial on the ground of undisclosed exculpatory evidence, the defendant challenges the denial of the motion for a new trial.  He argues also that the evidence was insufficient to support the verdict, that it was an abuse of discretion to have denied his motion to suppress evidence that was seized without a warrant, and that a number of the judge's evidentiary rulings were erroneous.  In addition, the defendant seeks relief pursuant to G. L. c. 278, § 33E.

We affirm the defendant's conviction of murder in the first degree, and, having reviewed the entire record pursuant to our statutory duty under G. L. c. 278, 33E, we decline to order a new trial or reduce the verdict.

1.  Background.  Because the defendant challenges the sufficiency of the evidence, we recite the facts in the light most favorable to the Commonwealth, reserving some details for later discussion.  See Commonwealth v. Bolling, 462 Mass. 440, 442 (2012).

The victim lived on the fourth floor of an apartment building on Main Street in Everett.  She, along with her

sisters, Rose Angela Carla dos Santos and Ana Paula Carla dos Santos, worked as dancers at a strip club in Chelsea, and later in Stoughton.[1]  She met the defendant at the Chelsea club at some point in 2006.  The defendant became friends with the victim and her sisters, and eventually started dating the victim.  That relationship ended approximately six months prior to the victim's death.  Despite the break up, the defendant continued to socialize with the victim and her sister, Ana.  The three of them went out together to nightclubs and other gatherings attended by members of the Brazilian community, and the three frequently spoke on the telephone.

In April 2009, the victim entered into a relationship with a married man named Oliver.[2]  On September 26, 2009, a week before the victim's death, the defendant and Oliver were at the Stoughton club where the victim and her sisters worked.  The victim paid attention to Oliver in between dances, and the defendant did not stay long.  The next day, the defendant visited Ana at her house.  He sat down on the floor, and was "a little sad" and "quiet"; he expressed dismay over the victim's decision to date a married man.

---

[1] Because they share the same last name, we refer to the victim's sisters by their first names.

[2] A pseudonym.

On September 30, 2009, the defendant and one of his roommates, Darles DeSouza, attended a barbeque at Ana's house to celebrate her birthday.  The defendant got "a bit agitated" when the victim did not show up.  He asked Ana to contact the victim to get her to join them.  When Ana told the defendant that the victim was on a date and might stop by later, the defendant commented that he had suspected that she was out with someone.  As the night progressed, the defendant called the victim to see what time she would arrive; he held his cellular telephone in his hand and appeared to be waiting for her.  After the defendant and DeSouza returned to their Somerville apartment, the defendant remained outside in his silver Nissan Murano and attempted to telephone the victim.

In the early morning hours of October 1, 2009, the defendant telephoned Ana and told her that he could no longer be friends with her "because he wasn't a good person."  The defendant explained that he had been using drugs and that his life for the past six months had had no meaning.  He asked Ana to give her sister (the victim) a message that "[s]he was dealing with a person who has no life."  Ana attempted to console the defendant; she told him to think about his family and children, and that she would help him find another girlfriend.  The defendant responded that he only was interested in the victim.

Later that morning, the defendant sent Ana a text message that he was feeling better. He also would "not do anything wrong." Before Ana left for her evening shift at the club, she and the defendant spoke by telephone. The defendant said that he had not wanted to go to work that day because he "wasn't in the mood." He asked Ana, "Is your sister going to work today?" Ana replied, "I don't know. I think so."

At that time, the defendant lived on Melvin Street in Somerville with DeSouza and another roommate, Washington Silveira. The defendant slept on a spare mattress in DeSouza's bedroom, and stored some of his belongings in the closet. In the evening of October 1, 2009, DeSouza came home from work, ate dinner with the defendant, and began watching a movie in the living room. The defendant went into the bedroom before the movie ended. After the movie, DeSouza went into his bedroom, and noticed that the defendant was lying on his mattress wearing a jacket and pants. This was slightly unusual, but not entirely out of the ordinary; the defendant sometimes would be in bed, dressed, when he planned to go out later that night. DeSouza fell asleep. When he woke up the next morning, at 6 A.M., the defendant was talking to someone on his cellular telephone.

The victim worked at the Stoughton club in the evening of October 1-2, 2009, and drove home in her 2006 Honda CR-V shortly after the club closed at 1 A.M. At 1:11 A.M, during her drive

home, the victim called her sister Ana; she sounded "normal." At 1:12 A.M, a vehicle that appeared to be consistent with the defendant's Nissan Murano was captured by a surveillance video camera located on the corner of Melvin Street and Broadway in Somerville. The video recording showed this vehicle pull out of a parking space on Melvin Street, near the defendant's apartment building.

At 1:38 A.M., a vehicle resembling the defendant's Nissan Murano drove around a traffic circle in Everett and headed in the direction of the victim's apartment building. A few minutes later, at 1:42 A.M., a Honda CR-V drove around the traffic circle, heading in the same direction. At 1:44 A.M., surveillance footage from a camera facing Tileston Street in Everett captured an image of a similar vehicle driving near the victim's apartment building. Back on Melvin Street in Somerville, at 1:53 A.M., a vehicle that appeared similar to the defendant's Nissan Murano pulled up and parallel parked in the same space from which a vehicle like a Nissan Murano had pulled out fifty-one minutes earlier. A man got out of the vehicle and walked in the direction of the defendant's apartment building.[3]

Shortly before 2 A.M., one of the victim's neighbors, who lived on the second floor of the building, was awakened by a

---

[3] The distance between the victim's apartment building and the defendant's apartment building is approximately three miles.

woman's screams coming from the parking lot behind the apartment building. He got up, heard another scream, looked outside, and did not see anything. Approximately thirty to forty seconds after the second scream, the neighbor saw someone walk down the last few steps of the rear staircase, and jog through the parking lot and around a Dumpster. The neighbor described the individual as a man in his twenties or thirties, wearing a tan or brown jacket and jeans. The neighbor went back to bed sometime around 2 A.M.

At 1:43 A.M., a woman who lived on Laurel Street, in an apartment that faced the rear of the victim's building on Main Street, also was also awakened by a woman's screams. She heard the woman yell, "Get off me, get off me, get away from me," but did not see anything amiss when she looked outside. Believing that the screams were connected to one of the many parties that her neighbors hosted, the woman went back to bed without calling the police.

At 4:30 A.M., a resident of the victim's building went outside to empty his trash and found the victim lying face down in a pool of blood on the landing outside the back door. She had been stabbed or cut thirty-one times; she had seventeen stab wounds in the torso, and multiple knife wounds in both arms. The victim's handbag, cellular telephone, and keys were next to

her body.  The wallet contained her credit cards and a few hundred dollars in cash.  This neighbor telephoned 911.

Police investigators spoke to members of the victim's family.  Ana told the officers, "I have a suspect for you."  The police then attempted to locate the defendant.  A detective was able to reach the defendant on his cellular telephone.  The defendant agreed to meet investigators at the Everett police station at 2 P.M.; he did not appear at the police station at that time.  Eventually, the defendant informed police that he was at the Malden District Court paying traffic fines.  Three Everett police officers drove to the Malden District Court and met the defendant there.  He agreed to accompany the officers to the Everett police station.  When they arrived at the station, one of the officers noticed injuries on the back of the defendant's hands.  An officer contacted a forensic scientist, Eric Koester, who worked at the State police crime laboratory (crime lab), and asked him to come to the police station to test for possible nonvisible blood.  Koester swabbed both of the defendant's hands, and the defendant then left the police station.

A crime lab analyst examined deoxyribonucleic acid (DNA) extracted from the swabs collected by Koester and determined that the victim was included as a possible contributor to a DNA mixture on the back of both of the defendant's hands.  The swab

from the right hand was a mixture of at least three people. The defendant matched the major profile, and the victim was included as a potential contributor to the minor profile. The swab from the left hand contained a mixture of DNA from at least two people; the defendant's DNA matched the major profile, and the victim was included as a potential contributor to the minor profile.

On October 2, 2009, police executed search warrants for the defendant's apartment and his two vehicles (the Nissan Murano and a GMC pickup truck). Police seized a pair of bloodstained sneakers from a bedroom closet. Later testing showed that DNA from a bloodstain on the top of the toe of the left sneaker matched the victim's DNA profile. Another bloodstain on the side of the right sneaker, not visible to the naked eye, contained a mixture of DNA; the major profile from that sample matched the victim's DNA profile.[4]

Police also collected scrapings from underneath the victim's fingernails. The scrapings from her left hand tested

---

[4] The search of the GMC truck and the Nissan Murano revealed no inculpatory evidence. Forensic chemists conducted screening tests of the exterior and interior of the vehicles for the presence of blood, in locations where one might expect to find transferred blood, e.g., on the steering wheel, control knobs, door handles, gear shift, and seats. All areas tested negative for the presence of blood.

positive for male "Y-STR" DNA,[5] and contained a mixture of DNA from at least four men.  The defendant (and his paternal relatives) were included as possible contributors to the major profile.  Oliver (and his paternal relatives) were included as a potential source of the minor profile in this DNA mixture.  The crime lab obtained both STR and Y-STR DNA results from the victim's right fingernail scrapings.  With respect to the STR profile, the defendant was included as a possible contributor, and Oliver was excluded.  The Y-STR DNA testing produced a mixture of at least three male profiles.  The defendant (and his paternal relatives) were included as possible contributors to the major profile; and Oliver (and his paternal relatives) were included as possible contributors to the minor profile.[6]

2.  Discussion.  In this direct appeal, the defendant presents four claims, and asks this court to grant him relief under G. L. c. 278, § 33E, and order a new trial or direct the entry of a verdict of a lesser degree of guilt.  The defendant contends that the trial judge abused her discretion in denying his motion for a new trial based in large part upon evidence

_____

[5] "Y-STR" refers to the Y-chromosome short tandem repeat method of testing DNA.  See, e.g., Commonwealth v. Dirico, 480 Mass. 491, 494 (2018).

[6] Oliver testified that he visited the victim's apartment at approximately 5 P.M. on October 1, 2009, and that they were intimate.

that forensic scientist Eric Koester had failed required proficiency tests. The defendant also challenges the sufficiency of the evidence that he killed the victim. In addition, he argues that the police conducted an illegal warrantless search by swabbing his hands to detect the presence of nonvisible blood, and that a subsequent warrant authorizing a search of his apartment was not supported by probable cause. The defendant argues further that the trial judge abused her discretion in making certain evidentiary rulings, including allowing the introduction in evidence of an adoptive admission. Finally, the defendant asks this court to exercise its authority, pursuant to G. L. c. 278, § 33E, and order a new trial or direct the entry of a lesser degree of guilt.

a. Motion for new trial. Following his conviction of murder in the first degree in March 2012, the defendant's appeal was entered in this court in June 2013. In February 2015, the Commonwealth provided the defendant with postconviction discovery. The discovery included a September 2014 memorandum from the crime lab reporting that Koester repeatedly had failed proficiency tests in bloodstain pattern analysis and the recovery of trace evidence. The Commonwealth also provided the defendant with a "corrected" DNA STR and Y-STR report that showed a significant reduction in the probabilities of the

combined STR and Y-STR results appearing randomly in the population.[7]

After receiving the information concerning Koester's failed proficiency tests, the defendant filed a motion for a new trial in this court, on the ground that the Commonwealth had failed to provide exculpatory evidence. In the alternative, the defendant argued that the information constituted newly discovered evidence that "casts real doubt on the justice of the conviction" and "probably would have been a real factor in the jury's deliberations." See Commonwealth v. Lykus, 451 Mass. 310, 326 (2008). In addition, the defendant maintained that errors in the DNA probability calculations, combined with other issues concerning the forensic testing, warranted a new trial.[8]

---

[7] The corrected report did not combine the probability of the Y-STR and STR results, as the original report incorrectly had done.

[8] The defendant moved, pursuant to Mass. R. Crim. P. 17 (a) (2), 378 Mass. 885 (1979) and Mass. R. Crim. P. 30 (c) (4), as appearing in 435 Mass. 1501 (2001), for additional documents relative to Koester's employment and job performance. The trial judge denied the motion. She found that the defendant had not established that the "discovery is reasonably likely to uncover evidence that might warrant granting a new trial," primarily due to Koester's "very limited role in this case." Given the nature of Koester's involvement, we discern no abuse of discretion in the judge's decision. See Commonwealth v. Daniels, 445 Mass. 392, 407 (2005) (defendant is required to demonstrate discovery reasonable likely to uncover evidence that might warrant granting new trial).

The appeal was stayed in this court and the motion for a new trial was remanded to the Superior Court.

The trial judge denied the motion without a hearing.  She found that the issues raised by Koester's failed proficiency tests did not negate the "overwhelming" evidence that the defendant had killed the victim.  As to the corrected statistics involving the probability of DNA matches, the judge noted that the new calculations did not eliminate the defendant as a possible contributor to the DNA found underneath the victim's right hand fingernails.  The judge concluded, "This court remains fully satisfied that the allegedly absent evidence would not have played any role in the jury's deliberations and conclusions, given the overwhelming evidence of the defendant's guilt."

Pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), a judge "may grant a new trial at any time if it appears that justice may not have been done."  In reviewing the denial of a motion for new trial, we "examine the motion judge's conclusions only to determine whether there has been a significant error of law or other abuses of discretion." Commonwealth v. Grace, 397 Mass. 303, 307 (1986).  In conducting this review, we afford particular deference to factual determinations made by a motion judge who was also the trial judge.  Commonwealth v. Forte, 469 Mass. 469, 488 (2014).

In addition, we review the consolidated appeal of the defendant's conviction and the denial of his motion for a new trial under G. L. c. 278, § 33E.  Commonwealth v. Moore, 480 Mass. 799, 805 (2018), citing Commonwealth v. Alicia, 464 Mass. 837, 840 (2013).  Thus, we examine the denial of a motion for a new trial to determine whether there was error, and, if so, whether the error created a substantial likelihood of a miscarriage of justice.  Commonwealth v. Vargas, 475 Mass. 338, 355 (2016).

i.  Proficiency tests.  Turning first to the evidence concerning Koester's failed proficiency tests, the parties dispute whether this evidence was known to the Commonwealth before the March 2012 trial.  The defendant relies on an affidavit submitted by his DNA expert, and maintains that "an accredited forensic laboratory" would have known before trial that Koester had failed the proficiency tests.  According to the expert, laboratories typically evaluate tests before the results are finalized and reported to the forensic scientist.  He opined that "the information regarding the failed . . . proficiency tests was available to the [State] laboratory by the beginning of 2012, well before the March 2012 trial."  Thus, the defendant argues, he is entitled to a new trial because the Commonwealth failed to provide exculpatory evidence in its possession prior to the time of trial.

The Commonwealth contends that the information concerning Koester's test results was not in its possession or control at the time of trial, because the information did not come into existence until after the defendant's trial. The Commonwealth argues accordingly that, at most, the information regarding Koester should be considered newly discovered evidence. See Commonwealth v. Clemente, 452 Mass. 295, 312 (2008), cert. denied, 555 U.S. 1181 (2009) ("obligation to disclose exculpatory information is limited to that in the possession of the prosecutor or police" [citation omitted]). Although Koester was required to complete the tests in 2010 and 2011, the Commonwealth argues, the tests were not graded until May 2012, a few months after the trial from March 15 through March 30, 2012.

In "March of 2012, [however, Koester] became the subject of an ongoing corrective action by Lab Management, due to deficiencies identified during the annual proficiency testing program."[9] That the State police took "corrective action" against Koester in March of 2012 appears to indicate that the Commonwealth, through the State police, was aware of his deficient performance at least before the end of the defendant's trial. Regardless of whether the prosecutor was aware of the

---

[9] Koester also was the subject of a separate "contamination event" in October 2012. Koester resigned from his position at the crime lab at the beginning of April 2014.

test results at any point during the trial, the defendant is unable to establish a reasonable possibility that the evidence would have made a difference in the jury's verdict.  See Commonwealth v. Sullivan, 478 Mass. 369, 382 (2017).

     "To obtain a new trial on the basis of nondisclosed exculpatory evidence, a defendant must establish (1) that the evidence was in the possession, custody, or control of the prosecutor or a person subject to the prosecutor's control; (2) that the evidence is exculpatory; and (3) prejudice" (quotations, citation and alteration omitted).  Id. at 380. Where a defendant files a specific request for exculpatory evidence, "the defendant must demonstrate . . . the existence of a substantial basis for claiming prejudice," Commonwealth v. Imbert, 479 Mass. 575, 582 (2018), quoting Commonwealth v. Watkins, 473 Mass. 222, 231 (2015).  A defendant "can meet [this] burden 'with record support for the conclusion that the jury would have been influenced by timely disclosure of the evidence in question,'" Imbert, supra, quoting Commonwealth v. Bly, 448 Mass. 473, 486 (2007), e.g., that "there is a reasonable possibility that the nondisclosed evidence would have made a difference."  Imbert, supra, quoting Commonwealth v. Laguer, 448 Mass. 585, 594 (2007).  "Where, on the other hand, a defendant's pretrial motion was merely a general request for exculpatory evidence, the defendant must show that the withheld

evidence 'would probably have been a real factor in the jury's deliberations'" (citation omitted).  Watkins, supra.

Here, the defendant concedes that he made a general request for exculpatory evidence, and did not make a specific request. Accordingly, we consider whether there was prejudice from the nondisclosure of exculpatory evidence under the standard used to assess the impact of newly discovered evidence, Commonwealth v. Murray, 461 Mass. 10, 21 (2011), and evaluate "whether there is a substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial," Commonwealth v. Tucceri, 412 Mass. 401, 413 (1992).

Given Koester's limited role in this case, we conclude that there was no abuse of discretion in the trial judge's decision that the defendant was not entitled to relief.  The judge's finding that Koester played a relatively minor role in the criminal investigation against the defendant is supported by the trial record.  Koester responded to the crime scene, marked the location of evidence, and performed a bloodstain pattern analysis that was not central to the case.  Later that day, Koester swabbed the defendant's hands at the police station. The swabs were submitted to another scientist for DNA testing. Although Koester officially supervised the two criminalists who searched the defendant's apartment, Koester was not present when they recovered the defendant's sneakers, and he did not test the

sneakers for the presence of blood or DNA.  Cf. Commonwealth v. Hernandez, 481 Mass. 189, 197 (2018) (no prejudice warranting new trial where Koester was present as supervisor but played limited role in investigation); Commonwealth v. Sullivan, 478 Mass. at 383 ("actual DNA testing, in which Koester had no direct role, likely did the most damage").

ii.  Calculation of DNA statistics.  We turn to the defendant's contention that he is entitled to a new trial because the crime lab has revised the method it uses to calculate the probability of random matches in cases involving both STR and Y-STR results.

At trial, the DNA analyst testified that the STR profile obtained from the fingernail clippings of the victim's right hand was a mixture of at least two individuals, and that the victim's DNA matched the major profile.  The defendant was included as a potential contributor to the minor profile.  The analyst testified further that the Y-STR results revealed DNA from at least three males.  The defendant's DNA (and that of his paternal relatives) matched the major profile of the Y-STR profile, and Oliver's DNA (and that of his paternal relatives) matched the minor profile.  The analyst then explained that she had calculated the probabilities of the STR and Y-STR profiles found on the victim's right fingernails by "tak[ing] the statistic for the STR results . . . multiplied by the statistic

for the Y-STR results. . . ."  Based on this method, the analyst testified, the probability of a randomly selected unrelated individual having the same STR and Y-STR profile was one in 326,900 of the Caucasian population, one in 423,000 of the African-American population, and one in 118,900 of the Hispanic population.

After trial, the crime lab issued a "Corrected DNA STR/Y-STR Report" that eliminated the original "combined STR and Y-STR frequency data (i.e. combined statistic)" from the report. According to the revised calculation, the probability of a randomly selected individual having contributed to the STR DNA mixture found on the fingernail cuttings from the victim's right hand was one in 307 of the Caucasian population, one in 452 of the African-American population, and one in 212 of the Hispanic population.  The Y-STR DNA from the same sample matched the defendant (and his paternal relatives) with a ratio of one in 1,065 for the Caucasian population, one in 936 for the African-American population, and one in 561 for the Hispanic population.

We agree with the defendant's DNA expert that the difference between the original and corrected match probabilities is "statistically significant."  In the circumstances of this case, however, the revised probability calculations do not cast doubt on the justice of the conviction. The newly reported STR and Y-STR statistics were less damaging,

but not exculpatory.  Contrast Commonwealth v. Cameron, 473 Mass. 100, 104-110 (2015) (newly discovered DNA evidence bolstered argument that DNA test results presented at trial were erroneous); Commonwealth v. Cowels, 470 Mass. 607, 620 (2015) (outcome of trial might have been different because new DNA testing contradicted evidence that Commonwealth used to corroborate key witness).  Moreover, the value of the revised statistics must be considered in light of the other DNA evidence introduced at trial connecting the defendant to the crime.  This evidence includes a blood stain found on the defendant's left sneaker which matched the victim's DNA profile, with probabilities of one in 14.96 quintillion of the Caucasian population, one in 3.26 septillion of the African-American population, and one in 9.443 quintillion of the Hispanic population.

b.  Sufficiency of the evidence.  The defendant contends that there was insufficient evidence to support the murder conviction.  He argues that the evidence, at best, established that he had had a prior relationship with the victim.  According to the defendant, in denying his motion for a directed verdict, the judge failed to take into account several pieces of exculpatory evidence including that the defendant's roommates did not hear him leave the apartment the night of the stabbing; the police searched his apartment and vehicles and did not

recover the murder weapon; he and the victim had ended their relationship amicably; and others had a motive to kill the victim, such as Oliver or an unknown strip club patron.

We rely on the familiar Latimore standard in determining whether the Commonwealth met its burden to establish each element of the offense charged beyond a reasonable doubt.  See Latimore, 378 Mass. 671, 677-678 (1979).  "[The] question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 677, quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Although a conviction may be based entirely on circumstantial evidence, and the inferences drawn need only be reasonable, not inescapable, a "conviction may not rest on the piling of inference upon inference or on conjecture and speculation."  Commonwealth v. Lao, 443 Mass. 770, 779 (2005), citing Commonwealth v. Swafford, 441 Mass. 329, 339-343 (2004).

Here, as the judge discussed in denying the defendant's motion for a new trial, the evidence against the defendant was "overwhelming."  There was no error in the denial of his motion for a directed verdict.

c.  Motion to suppress.  The defendant sought to suppress the DNA evidence from the swabbing of his hands, on the ground that the Everett police lacked probable cause and the defendant

did not consent to the taking of swabs from his hands at the police station, and that there was no probable cause to support the issuance of a warrant to search his apartment. After a two-day evidentiary hearing, a Superior Court judge denied the defendant's motion to suppress. The judge found that the warrantless search of the defendant's hands was supported both by probable cause to believe that the defendant's hands contained evidence of a crime and exigent circumstances. The judge found also that the search warrant affidavit established probable cause to search the defendant's apartment.

i. Search of defendant's hands. "In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error and leave to the judge the responsibility of determining the weight and credibility to be given oral testimony presented at the motion hearing." Commonwealth v. Wilson, 441 Mass. 390, 393 (2004). "We review independently the application of constitutional principles to the facts found." Id. See Commonwealth v. Cassino, 474 Mass. 85, 88 (2016).

At the hearing, evidence was introduced that, on October 2, 2009, Everett police responded to a 911 call and found the victim dead of apparent stab wounds, outside the rear entrance to her apartment building. The victim's neighbor indicated that, at approximately 2 A.M. that morning, he had heard a

scream from the rear of the building.  He saw a white or Hispanic male, wearing a light brown jacket and jeans, "trot" away from the building, across the parking lot, in the direction of Laurel Street.  A Laurel Street resident heard a scream around 1:45 A.M., and another neighbor reported that a motion detector had activated at approximately the same time.

A few hours after the discovery of the victim's body, her sister, Ana, identified the defendant as a suspect in the victim's death.  Ana told police that "Sheila [and the defendant] had dated . . . a while ago" and had stopped dating, but that the defendant was trying to get back together with Sheila.  Ana reported that "the defendant had been stalking [Shelia] or constantly calling [Sheila]."  On September 30, 2009, while she was at a barbeque, Ana overheard the defendant yelling and arguing with the victim on his cellular telephone.  At 1 A.M. on October 1, 2009, the defendant had called Ana and told her that he wanted to reestablish a romantic relationship with the victim, that he was desperate, and that the victim did not know who she was dealing with because he had nothing in his life.

On the morning of October 2, 2009, investigators spoke with Alcenir Alvarenga, the victim's closest friend.  Alvarenga told the officers she had visited the victim on October 1, 2009.  During that visit, the victim said that the defendant had

telephoned her and said that if he could not be with the victim, no one would, and that he would kill her and himself.  Alvarenga showed the investigators the defendant's house, pointed out the defendant's pickup truck, and told them that the defendant drove a silver Nissan Murano.

Investigators examined traffic surveillance video footage and noted that, at approximately 1:42 $\underline{A}$.$\underline{M}$. on October 2, 2009, a Honda CR-V resembling the victim's vehicle entered Sweeter Circle and exited on Main Street.  A silver Nissan Murano entered the same traffic circle about four to five minutes before what appeared to be the victim's vehicle, and also exited onto Main Street.  Surveillance video footage from a commercial building showed a silver Nissan Murano on Tileston Street, near the victim's house, leaving the area at 1:44 $\underline{A}$.$\underline{M}$.

Shortly before 1 $\underline{P}$.$\underline{M}$. on October 2, 2009, a detective contacted the defendant and asked to speak with him.  The defendant agreed to meet the detective at the Everett police station within an hour, but did not show up for the meeting.  At 2:25 $\underline{P}$.$\underline{M}$., the same detective contacted the defendant and learned that he had gone to the Malden District Court to pay some traffic fines, and that he planned to stop by the Everett police station after he completed his errand at the court house.  Three police officers went to the court house to meet the defendant.  The defendant confirmed that he owned a silver

Nissan Murano.  He agreed to accompany the officers to the police station in their vehicle.  He was not handcuffed, placed under arrest, or questioned during the ride.

The defendant and the officers arrived at the police station at 3:30 P.M.  An officer took the defendant to an interview room, where the officer advised the defendant of the Miranda rights and provided him a waiver form.  The defendant asserted his right to counsel, and questioning ended.

During this process, one of the officers noticed some cuts on the defendant's hands.  The investigators photographed the cuts and requested a State police chemist come to the station to test the defendant's hands for the presence of blood.  Koester arrived at 4:30 P.M.  He conducted a screening test for the presence of nonvisible blood.  The backs of both of the defendant's hands tested positive.  Koester then collected swabs from the backs of each of the defendant's hands.  The defendant was not provided an opportunity to refuse these tests.  After the testing, at approximately 5:20 P.M., the defendant left the interview room and waited in the police station lobby for a ride home.

The motion judge found, based on "the information accumulated to that point," that there was probable cause to believe that the defendant "had been involved" in the killing, and that there might be trace evidence on his hands.  That

evidence "could easily have been lost if the defendant were allowed to leave the station and clean up his hands." The judge concluded, "The actions of the investigators were warranted by the existence of probable cause and by the exigency of the situation in which evidence could be lost if not collected then."[10]

"When a search is conducted without a warrant, the burden is on the Commonwealth to show that the search falls within a narrow class of permissible exceptions to the warrant requirement (citation omitted)." Commonwealth v. Abdallah, 475 Mass. 47, 51-52 (2016). One such exception to the warrant requirement is a search based on probable cause and exigent circumstances that make obtaining a warrant impracticable. Commonwealth v. White, 475 Mass. 583, 588 (2016), quoting Commonwealth v. Washington, 449 Mass. 476, 480 (2007). "A reasonable belief as to the potential loss or destruction of evidence may create exigent circumstances permitting the warrantless . . . seizure of that evidence" (citation omitted). Commonwealth v. Parker, 481 Mass. 69, 73 (2018).

We agree with the motion judge's determination that the Commonwealth established probable cause to swab the defendant's

---

[10] At 11 P.M., the investigators obtained warrants authorizing the search of the defendant's apartment and vehicles.

hands, and that it was necessary to do so to prevent to loss or destruction of that evidence. The officers knew that the victim had dated the defendant and that the defendant was trying to get back together with her. The victim's sister reported that the defendant had been stalking or constantly calling the victim. According to one of the victim's friends, the day before the stabbing, the victim told her that the defendant had threatened to kill the victim. The victim was stabbed in Everett at approximately 1:45 A.M. on October 2, 2009. A short time earlier, a vehicle resembling the defendant's silver Nissan Murano entered a traffic circle in Everett and drove off in the direction of the victim's apartment. At 1:42 A.M., the victim's vehicle had driven through the same traffic circle.

As discussed, later on October 2, police spoke with the defendant and noticed cuts on the back of his hands. The defendant was wearing a tan jacket and matched the general description provided by the victim's upstairs neighbor, who had been awoken by a woman screaming and, when he looked out the window, saw a Caucasian or Hispanic male wearing a light brown jacket and walking away from the building.

In addition, there was no abuse of discretion in the motion judge's determination, based on uncontroverted evidence, that nonvisible blood might have been lost if the defendant were allowed to leave the police station and wash his hands. See

Washington, 449 Mass. at 483-485; Commonwealth v. Hinds, 437 Mass. 54, 62 (2002), cert. denied, 537 U.S. 1205 (2003).

ii. Search of the defendant's apartment. The defendant argues that evidence seized from his apartment should have been suppressed because there was insufficient evidence to have issued the search warrant. The motion judge found that the warrant affidavit established "a substantial basis to believe that there was a nexus between the murder of [the victim], the defendant, his vehicles, and his apartment."

The defendant challenges the reliability of information contained in the warrant affidavit that was attributed to the victim's sister, Ana, and the victim's friend, Alvarenga. The officer who prepared the warrant affidavit, Trooper Jeffrey A. Saunders, stated that the police had learned, through interviews with the victim's family and friends, that the defendant "had been threatening to kill [the victim] if she did not have sex with him as recently as Thursday, October 1, 2009." Ana told investigators about a conversation that she had had with the defendant, during which the defendant said that "he was shooting drugs because he was desperate to get back together with [the victim]." The defendant also told Ana that "her sister 'did not know who she is dealing with.'" On October 1, 2009, the victim told Alvarenga that the defendant had called her during the day

and told the victim that he would kill himself or her if she would not sleep with him.

The defendant argues that these statements were "primarily" or "entirely" based on hearsay, and that the information did not satisfy the two-pronged Aguilar-Spinelli test concerning an informant's basis of knowledge and veracity. See Spinelli v. United States, 393 U.S. 410 (1969); Aguilar v. Texas, 378 U.S. 108 (1964). Where the source of information is an identified witness to a crime, the informant generally is considered more creditable. See Commonwealth v. Gouse, 461 Mass. 787, 793 (2012); Commonwealth v. Freiberg, 405 Mass. 282, 297-298, cert. denied, 493 U.S. 940 (1989); Commonwealth v. Burt, 393 Mass. 703, 710 (1985). In addition, independent police corroboration may serve to bolster the reliability of information contained in an affidavit. See Commonwealth v. Robinson, 403 Mass. 163, 166 (1988).

Here, the basis of knowledge prong was satisfied because the victim's sister informed police of an admission made by the defendant. See Commonwealth v. Crawford, 410 Mass. 75, 78-79 (1991), S.C., 417 Mass. 40 (1994) (defendant's admission satisfies basis of knowledge); Commonwealth v. Peterson, 61 Mass. App. Ct. 632, 635 (2004) (basis of knowledge inferred through witness's relationship with defendant). Moreover, it was clear that the victim was the source of the information

provided by Alvarenga, as she said the victim had called her. Ultimately, the motion judge deemed the information was reliable because it was provided by an identified witnesses to a crime. See Commonwealth v. Beliard, 443 Mass. 79, 85 (2004); Commonwealth v. Alvarez, 422 Mass. 198, 204 (1996). In addition, other evidence mentioned in the warrant affidavit, including video surveillance showing a silver Murano driving near the victim's apartment building during the relevant time frame, and the cuts on the defendant's hands, corroborated the statements. We discern no error in the judge's determination that there was probable cause to issue the search warrant for the defendant's house and vehicles.

d. Adoptive admissions. The Commonwealth moved in limine to admit certain statements by the defendant as adoptive admissions or as consciousness of guilt. The defendant opposed the motion. After a hearing, the judge allowed the testimony to be introduced, with a limiting instruction, as an adoptive admission.

At trial, over the defendant's objection, Ana testified that, when she learned of the victim's death from her sister Rose, she called the defendant and asked him, "Where is my sister?" The defendant answered, "I don't know. I haven't seen her for a week." Ana then accused the defendant of killing her sister, saying, "You killed my sister. You can run. I'm gonna

kill you. I'm gonna kill your family. I'm gonna kill your children. I'm gonna kill everyone." The defendant hung up.

Immediately after this testimony was introduced, the judge gave a limiting instruction and told the jury that they must "be sure that any conclusions you draw are fair conclusions," and that they also must be sure that the defendant "heard any accusation and understood its significance." She further instructed that the jury must be "satisfied that it is a fair conclusion that a person would always speak up in a situation like that if he were innocent. After all, no one is required to respond to any negative comment made about him, and there may be other factors in a given situation apart from guilt or innocence with respect to the particular accusation that might explain why a person did not choose to respond."

To prove that a statement was an adoptive admission on the basis that a defendant remained silent in the face of an accusation, the Commonwealth must establish that (1) the defendant heard and understood the statement; (2) the defendant had an opportunity to respond; and (3) the context was one in which an individual would have been expected to respond to an accusation of criminal conduct. See Commonwealth v. Shea, 460 Mass. 163, 170 (2011), quoting Commonwealth v. Braley, 449 Mass. 316 321 (2007). See also Mass. G. Evid. § 801(d)(2)(B) (2018). "Evidence of this nature is to be received with caution,

especially in criminal cases, due to the fact that the meaning of a defendant's response, or lack thereof, to an accusatory statement is often ambiguous."  Commonwealth v. McKenzie, 413 Mass. 498, 506 (1992).  See Commonwealth v. Rembiszewski, 363 Mass. 311, 316 (1973) (expressing court's "general wariness of adoptive admissions").

In these circumstances, where Ana had called the defendant and was expressly threatening to hunt him down, and kill him and his family, the judge's decision to allow the introduction of these statements as an adoptive admission was an abuse of discretion.  See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  We cannot say that it would be reasonable to believe that someone receiving such a threatening telephone call ordinarily would respond by denying having killed anyone. Hanging up the telephone and refusing to deal further with an irate and threatening caller would appear to be a natural response, and, in any event, cannot be seen as an admission of guilt.  See McKenzie, 413 Mass. at 506.

Although the evidence should not have been admitted, there was no prejudice to the defendant from its admission requiring reversal.  See Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).  Other testimony already had been introduced indicating that Ana accused the defendant of killing her sister; indeed, that testimony was introduced by the defendant himself in his

challenge to the manner in which the police purportedly rushed to judgment during the investigation.  The jury most likely gave the testimony little weight given that Ana's threats did not reasonably call for a response.  In addition, as previously stated, the case against the defendant was overwhelming.

e.  <u>Grand jury testimony</u>.  The defendant contends that the judge erred by allowing the Commonwealth to introduce a portion of a testifying witness's testimony to the grand jury as a "prior recorded statement."  The Commonwealth argues that there was "some confusion as to the basis on which the testimony was offered," and that the testimony was admissible for substantive purposes due to a feigned loss of memory.  Because the defendant objected, we review to determine whether there was prejudicial error.  See <u>Commonwealth</u> v. <u>Martinez</u>, 431 Mass. 168, 173 (2000). We conclude that the Commonwealth did not establish a sufficient foundation for the admission of this testimony, but that introduction of the testimony was not reversible error.

The disputed testimony unfolded as follows.  The prosecutor asked the defendant's roommate, Washington Silveira, "What did the defendant tell you about [the victim] and his relationship with her?"  Silveira answered, "At first he would say that the relationship was good . . . ."  The prosecutor then asked if the relationship had changed at any point.  Silveira responded he "could not remember the exact words" the defendant used to

describe his changed relationship with the victim. When the prosecutor attempted to refresh Silveira's recollection with his grand jury testimony, Silveira testified, "At the moment I don't remember anymore. But if I said that at that time, that's what happened."

The prosecutor then sought to introduce, as "prior recorded testimony," a portion of Silveira's grand jury testimony. See Mass. G. Evid. § 804(b)(1) (2018) (hearsay exception where declarant unavailable). In making this argument, however, the prosecutor cited Commonwealth v. Daye, 393 Mass. 55, 72-75 (1984), and Commonwealth v. Berrio, 407 Mass. 37, 45 (1990), which permit the introduction of prior inconsistent statements by a witness that were made under oath before the grand jury, where the statements were not coerced, and were more than a mere confirmation or denial of the interrogator's question. See Mass. G. Evid. § 801(d)(1)(A) (2018). Defense counsel objected to the introduction of the statement as "past recollection recorded." See Mass. G. Evid. § 803(5) (2018). The judge allowed the prosecutor to introduce the testimony as prior recorded testimony. The prosecutor then read to the jury the following excerpt of Silveira's grand jury testimony:

"Q.: Did [the defendant] ever talk to you about [the victim]?

"A.: He told me once that he had to forget that low life, that he had to forget that low life women.

"<u>Q</u>.: Did he refer to her as a low life women, or did he specifically use the word whore?

"<u>A</u>.: Yes, he did specifically used the word whore.

"<u>Q</u>.: And do you remember when this was in relation to when [the victim] was killed?

"<u>A</u>.: It was a long time ago. I don't recall exactly. Maybe two or three months before.

"<u>Q</u>.: So that would have been sometime in July or August of 2009?

"<u>A</u>.: It could be."

We consider first whether, as the Commonwealth suggests, the judge properly allowed the grand jury testimony to be introduced based on a purported feigned loss of memory. Under our jurisprudence, when a witness, who is on the witness stand and therefore subject to cross-examination, feigns memory loss, the witness's grand jury testimony may be admitted as substantive evidence. See <u>Commonwealth</u> v. <u>DePina</u>, 476 Mass. 614, 621 (2017), citing <u>Commonwealth</u> v. <u>Maldonado</u>, 466 Mass. 742, 754-755, cert. denied, 572 U.S. 1125 (2014). In order to allow the introduction of grand jury testimony as substantive evidence, "[a] judge must find, first, that the witness is in fact feigning his or her lack of memory; second, that the grand jury testimony was not coerced; and third, that the grand jury testimony was in the witness's own words, involving more than

mere confirmations or denials of statements made by the interrogator."  DePina, supra.

Here, the Commonwealth did not ask the judge to allow the introduction of Silveira's grand jury testimony based on a feigned loss of memory, and the judge made no express findings that such a foundation had been established.  Based upon the judge's reference to the testimony as a prior recorded statement, and our review of the trial transcript, we do not agree with the Commonwealth's contention that the judge made implicit findings that supported the admission of the testimony.  See DePina, 476 Mass. at 621-622.  Thus, the grand jury testimony should not have been admitted.

Nonetheless, Silveira's testimony that the defendant referred to the victim as a "low life" and "whore" a few months before she was killed likely had little impact on the jury.  Flebotte, 417 Mass. at 353.  The prosecutor did not refer to these statements in her closing argument.  The significance of the derogatory comments is outweighed by the threats made by the defendant himself in the days immediately prior to the stabbing, on September 30 and October 1, 2009, as well as the circumstantial evidence connecting the defendant to the killing.  A new trial is not required on this basis.

6.  Relief under G. L. c. 278, § 33E.  We have carefully reviewed the entire record, pursuant to G. L. c. 278, § 33E, and

discern no reason to order a new trial or to reduce the degree of guilt.

Judgment affirmed.